Carole Adamaitis, Plaintiff-Appellee, v. Frank Hesser, Defendant-Appellant.

Gen. No. 49,844.

First District, First Division.

February 15, 1965.

Joseph A. Bailey and Henry H. Caldwell, of Chicago (Joseph A. Bailey and Henry H. Caldwell, of counsel), for appellant.

Fred Lambruschi, of Chicago (Fred Lambruschi, Herbert P. Veldenz, Vera E. Cuthbert, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

Defendant, Frank Hesser, appeals from a judgment of $7,500 for personal injuries suffered by the plaintiff, Carole Adamaitis, as the result of a collision when a car driven by defendant struck the rear of a car driven by plaintiff.

The sole issue was the nature and extent of plaintiff's injury and defendant contends that errors in the trial prevented him from having a trial free from prejudice.

While defendant admits that not every error, by itself, will vitiate the verdict of a jury, he contends that an accumulation of errors can indicate to the reviewing court that there existed the possibility that the verdict was largely influenced by those errors.

An examination of the evidence and proceedings on trial is therefore necessary to consider defendant's appeal for a new trial on the issue of damages or remittitur.

Early Sunday evening August 4, 1957 plaintiff, driving her car, stopped for traffic at Foster and Paulina Streets in the City of Chicago. There were two cars in front of her. She testified she heard a "screeching sound and felt a severe impact in back." She went forward against the wheel and when "I came back I felt my neck snap after I struck the car in front." She got out of the car and was assisted by a police officer. She said she was badly shaken up and her knees were "going to" give out. She denied talking to defendant, a physician, at the scene although he testified that she told him she was not hurt and refused his offer to have her X-rayed, hospitalized and given medical care. She saw damage to the front bumper and there was a dent in the rear bumper and trunk of her car.

Upon arriving home she began getting severe pain at the neck which worked down her shoulder and back. She applied a heating pad, tried to reach her family physician and, when unable to do so, made an appointment with Dr. Carder for the next morning. Dr. Carder had X-rays taken at the MacNeal Memorial Hospital, recommended a Queen Anne collar and prescribed medicine for pain. She wore the collar for three weeks and took heat treatments from Dr. Carder once or twice a week. She returned to work after losing twenty-five days in August and November. She saw her family physician, Dr. Plzak, after she re-

turned to work. He prescribed medication, a sleep board and suggested a heating pad when she "laid down." Her employer suggested a bone specialist, Dr. Rabin, who took X-rays of her in October or November and told her to keep up with the same treatments. She took aspirin and bufferin which gave her some relief along with the use of the heating pad. She had further X-rays taken at Loretto Hospital and submitted to an examination by Dr. Stack for the defendant in October, 1963. He ordered X-rays taken of her at Passavant Hospital. She further testified that she had lower back pains for a year but it had improved, and she could not say it bothered her. But she still complained of recurring severe pains in the neck and shoulder. When these pains were present she applied the heating pad.

Dr. Carder testified that he saw plaintiff the day after the occurrence. Her subjective complaints were stiffness in the neck, headaches and pain in the back. Objectively, he found she had a stiffness in the neck when attempt was made to move it from side to side or up and down. Stiffness and muscle spasm, he said, go together. He sent her to MacNeal Memorial Hospital for X-rays where they were interpreted, but not by him. He recommended a Queen Anne collar to be worn until the spasm subsided. He also prescribed A. P. C. with codeine for pain. He saw her five times, the last being August 26 when she still had the same complaints and said she was going to her family doctor for further treatments. She was also given diathermy treatments by Dr. Carder to increase circulation in the area.

Dr. Rabin testified that plaintiff, in October 1957, had spasm in the neck muscles together with tenderness in the back of the neck. Otherwise the findings were normal. His diagnosis from his examination of the plaintiff and the X-rays was that she sustained a

whiplash type sprain of the neck with multiple anterior subluxations of the second cervical vertebra on the third, the fifth cervical vertebra on the sixth, tearing of the posterior longitudinal ligaments of these levels, as well as sprain of the lower back, with some narrowing of the disk space between L-5 and S-1 and a congenital spina bifida occulta. The X-rays he had taken in January 1964 revealed the same condition and it was permanent in nature.

Dr. N. S. Zeitlin, interpreting an X-ray taken August 5, 1957, found an abnormal flattening of the sixth cervical disk between the sixth and seventh cervical vertebrae. An X-ray taken May 3, 1958, he said, showed the sixth cervical disk to be "literally one-half the size of the space below and one-half the size of the space above." He said it was constant and a permanent condition. He found the same condition in the January 1964 film.

The errors, defendant contends, occurred during the examination of Dr. Plzak, Virginia Venn and Dr. Stack.

Dr. Plzak, called on behalf of the plaintiff, was her family physician. He was unavailable at the time of the occurrence but subsequently rendered her treatment. He could not recall the treatment and did not have records available because, as he testified, a flash flood at his home caused their destruction. Plaintiff then produced, what we gather from the scant description in the record, an original typewritten letter on the doctor's stationery, but not signed by him. It was in possession of plaintiff's attorney, having been received at his request for a report of treatment the doctor rendered plaintiff after the occurrence. The doctor stated that he had no independent recollection of the treatments but that the document did refresh his recollection, having seen it at the office of plaintiff's attorney prior to his testifying. It was again

shown to him at the trial over defendant's objection. He then testified that he remembered treating the plaintiff September 7, October 18, November 29 and December 19, 1957. At that time she had pain and stiffness in the neck, back and shoulder. He diagnosed it as a severe whiplash injury to the neck and lower back. He was cross-examined in detail regarding these treatments as well as subsequent complaints plaintiff was treated for but which have no connection with the instant occurrence.

██ Defendant argues it was error to allow the doctor to refresh his recollection from the report because the testimony indicated that he saw it for the first time on the day of the trial; he had no copy of it in his files, and he was never asked whether notations had been made by him or, if so, when. His records for that period having been destroyed, no copy would be available. When inquiry was made of him on cross-examination regarding the notations on the report, he answered: "I would have dictated them, because I don't type." The only plausible inference from the record indicates that he dictated the letter and caused it to be mailed. He unequivocally asserted that it did refresh his recollection and nothing in the record or detailed cross-examination controverted or even slightly indicated otherwise. Defendant relies on Paliokaitis v. Checker Taxi Co., 324 Ill App 21, 57 NE2d 216 (1944), but we find that case inapposite. The statement of law in People v. Krauser, 315 Ill 485, 508, 146 NE 593 (1925), is more applicable:

> The rule in this State is that a witness can testify only to such facts as are within his knowledge and recollection, but he is permitted to refresh and assist his memory by the use of a written instrument, memorandum or entry in a book, and it is not necessary that the writing should have

been made by the witness himself or that it should have been an original writing, provided that after inspecting the record he can speak to the facts from his own recollection.

And in Scovill Mfg. Co. v. Cassidy, 275 Ill 462, 472, 114 NE 181 (1916), after quoting the above statement of law the court continued: "(N)either is it necessary that the writing thus used should be admissible in evidence". See also Walsh v. Chicago Rys. Co., 303 Ill 339, 345, 135 NE 709 (1922); Cleary, Handbook of Illinois Evidence, p 88 (2nd ed 1963). Under these circumstances, in the instant case, we hold the trial court did not commit error.

Virginia Venn, an employee of the personnel department of Hotpoint Company, plaintiff's employer, subpoenaed by both sides to produce the employment records, was called on behalf of defendant. On direct examination she testified that the records indicated plaintiff's vacation period was the weeks ending August 4 and August 11, 1957; that she worked three days in the week ending August 25 and had been paid for forty hours (1 week) previous thereto. On cross-examination plaintiff's counsel developed the fact that she was paid the vacation salary in the week of October 27, 1957, after she had fulfilled the required employment period of one year.

Counsel then produced a letter on the employer's stationery dated February 1, 1961 signed by Mrs. Claudia K. Deckow, supervisor of personnel records. This letter, addressed to plaintiff's counsel, was sent in reply to his request and designated thirty-five days, with dates, during which time plaintiff was absent from work "because of alleged injuries sustained in an accident." Defendant objected on the ground that the witness did not prepare it. A copy of the letter was in the company files. The court allowed it in

evidence. On cross-examination defendant's counsel produced a letter from his files signed by Claudia Deckow dated June 18, 1958 also stating days "Miss Adamaitis lost as a result of the automobile accident." This letter indicated plaintiff lost only seven days. A copy of this letter was also in the company's files.

Defendant contends the court committed error in allowing plaintiff's letter in evidence. Defendant cites Novicki v. Department of Finance, 373 Ill 342, 344, 26 NE2d 130 (1940), and its holding that "(T)he rule against hearsay evidence, that a witness may testify only as to facts within his personal knowledge and not as to what somebody else told him, is founded on the necessity of an opportunity for cross-examination, and is a basic and not a technical rule". There is no denial and the record indicates that plaintiff's personnel and work file at Hotpoint was available. The correspondence was in the regular course of Hotpoint's business. There evidently were inaccuracies in the letters and these could have been explained or corrected by reference to the file. Virginia Venn was not testifying to facts of her own personal knowledge but to matters she found in the business records of her employer. The facts indicate that copies of both letters were in the records of the company made in the regular order of business and that anything contradictory in them should and could have been corrected. Defendant failed to take the opportunity to clarify the record and he added to the confusion by providing the letter of June 18, 1958 addressed to his counsel. He cannot now take advantage of a situation in which he himself participated. We believe his contention in this regard is not meritorious.

Dr. Stack, defendant's medical expert, examined plaintiff and caused X-rays to be taken at the Passavant Hospital. He interpreted some of these X-rays and others introduced by plaintiff and testified that

there was no evidence of flattening of the lordatic curve or narrowing of the vertebral spaces shown in the X-rays, with the possible exception of the development of spina-bifida, "a common congenital condition." In his opinion plaintiff had not sustained important damage to the vertebral spaces in either the lumbar or cervical spine or structures which would result in disability over a long range period.

During cross-examination of the doctor, plaintiff's attorney produced the report of Dr. William Bundesen, roentgenologist and X-ray specialist at Passavant Hospital, to which defendant objected. The court held a discussion out of the presence of the jury during which defendant's counsel objected to the inquiry into whether the witness's interpretation of those X-rays differed from that of the roentgenologist, because Dr. Stack did not rely upon it, but relied on his own ability in interpreting the X-rays. There followed this colloquy:

> THE COURT: Do you think, counsel,—that counsel for the plaintiff has the right to ask the doctor on the stand whether or not he took into account the interpretation of Dr. Bundesen?
>
> MR. HOURIGAN: Yes, he has. If he has, then he has a right to ask him.
>
> . . . . . .
>
> THE COURT: You agree that he has a right to ask if his findings were based in part on the report of Dr. Bundesen?
>
> MR. HOURIGAN: If he based his opinion on that.
>
> . . . . . .
>
> THE COURT: If the doctor—I think I will ask that if he says "no", I didn't take into account the interpretation, I will say no, and if he says "yes", I will let you go on.

357

Thereafter counsel for plaintiff proceeded to cross-examine the doctor who said he did not request of Dr. Bundesen a copy of his findings but that such comes automatically, and that he did not discuss his findings with Dr. Bundesen nor did he take into account Dr. Bundesen's findings and interpretation. Counsel then proceeded further, without objection, and had the witness identify the roentgenologist as a specialist in his field and the fact that there was a difference in the interpretation of the X-rays regarding the cervical spine.

 It was error to proceed in this manner. The witness testified as to the X-rays and his interpretation and opinion, and he was subjected to cross-examination. That someone else differed in interpretation or opinion and was not subject to cross-examination makes such evidence purely hearsay and inadmissible. Kooyumjian v. Stevens, 10 Ill App2d 378, 391, 135 NE 2d 146 (1956).

 But the object of review is not to determine whether the record is completely free of error and, as defendant admits, it is not every error by itself that will vitiate the verdict. A case is reviewed to ascertain whether upon the trial there has been such error as might prejudice the rights of a party. And if this court concludes that the record is free of error prejudicial to defendant's rights, and that upon the fact it is a reasonable assumption that no different verdict would be reached on another trial, the verdict should be affirmed. Moore & Co. v. Champaign Nat. Bank, 13 Ill App2d 232, 141 NE2d 97 (1957). The ultimate goal of a court is a fair and just result and when it is clear that the case has been fairly tried and that the judgment is clearly right, the judgment should be affirmed. Kosowski v. McDonald Elevator Co., 33 Ill App2d 386, 397, 179 NE2d 469 (1962).

We believe that the error committed did not deprive defendant of a fair and just trial and that the cause was fairly tried. The only issue was the nature and extent of plaintiff's injury and the verdict is consistent with the evidence. We are not convinced that it is against the manifest weight of the evidence. It is our reasonable assumption that no different verdict would be reached if the cause were retried. The judgment of the trial court is affirmed.

Affirmed.

BURMAN, P. J. and MURPHY, J., concur.